IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | | |
|---|---|---|
| Samuel Todd Whatley, | ) | Civil Action No. 3:05-0042-JFA-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| South Carolina Department of Public Safety, | ) | |
| SC Dept of Motor Vehicles, Boykin Rose, | ) | |
| Individually and in his Official Capacity; | ) | |
| Marcia Adams, Individually and in her | ) | |
| Official Capacity; Jimmy Early, Individually and | ) | |
| in his Official Capacity; Phillip Cockrell, | ) | |
| Individually and in his Official Capacity; and | ) | **ORDER AND RECOMMENDATION** |
| and David Burgess, Individually and in his Official | ) | |
| Capacity; | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff, Samuel Todd Whatley ("Whatley"), brought this action through counsel against his former employers, the South Carolina Department of Public Safety ("DPS") and the South Carolina Department of Motor Vehicles "DMV").[1]   Also named as defendants were several present and former DPS/DMV employees: Boykin Rose ("Rose"), Marcia Adams ("Adams"), Jimmy Early ("Early"), Phillip Cockrell ("Cockrell"), and David Burgis ("Burgis").  The complaint stated four specific claims: (1) Religious Discrimination, Violation of First Amendment Rights; (2) Violation of the Family Medical Leave Act ("FMLA"); (3) Retaliation; and (4) Whistleblower-Title VII § 704(a).  Defendants made a motion for partial dismissal which was granted by order of the Honorable Joseph F. Anderson, Jr.,  Chief United States District Judge.  As the undersigned

---

[1]The complaint was filed by Whatley's attorney.  On September 15, 2005, counsel's motion to be relieved was granted, and Whatley has been pro se since that time.

interprets this order, Whatley retains a Title VII religious discrimination claim against DPS and DMV; a § 1983 religious discrimination/First Amendment claim against Rose, Adams, Early, Cockrell, and Burgis in their individual capacities (the "individual defendants"); and retaliation claims under Title VII, FMLA, and the South Carolina Whistleblower Act.[2]

Whatley (Doc. No. 32) and defendants (Doc.  No. 33) have filed motions for summary judgment.[3]  Additionally, the parties have continued to file various pleadings related to their motions for summary judgment and other issues.   These include:

1. Defendants' "Response to 'Motion for Judgment Under Plaintiff's Support of Federal Case Law, References, Other Stated Reasons and Pleas by the Plaintiff'"[4] (Doc.  No. 34);

2. Plaintiff's "Memorandum of Plaintiff's Response to Defendant's (sic) Motion/Memorandum and Supports Plaintiff's Motion for Judgment and Memorandum" (Doc. Nos. 42 and 43);

3. Plaintiff's "Addendum for Supportive Factual Evidence for the Plaintiff's Summary Judgment"[5] (Doc. No. 44);

---

[2]Whatley's "Whistleblower - Title VII § 704(a)" claim was dismissed as to all defendants. It appears that Whatley's attorney attempted to blend his Title VII retaliation claim with a retaliation claim under the South Carolina Whitleblower Act, S.C. Code Ann. § 8-27-10, et seq.

[3]Because Whatley is pro se, a Roseboro orders was issued on December 27, 2005, advising him of his responsibility to appropriately respond to defendants' motion for summary judgment.

[4]This is defendants' response to plaintiff's motion for summary judgment (Doc. No. 32).

[5]This "Addendum" contains a copy of the order of a South Carolina Workers Compensation Commissioner in the case of Whatley v. South Carolina Dep't. of Public Safety. ("WCC Order"). Defendants have moved to strike the addendum because the WCC Order is not a final order and Whatley cannot use the order under the doctrine of res judicata (Doc. No. 45).  However, in an
(continued...)

2

4.      Plaintiff's "Memorandum of Plaintiff's Arrow of Truth and Support for Plaintiff's Summary Judgment" (Doc. No. 46);

5.      Plaintiff's "Affidavit" (Doc. No. 49).  Rule 56(e), Fed. R. Civ. P., provides that "(s)upporting and opposing affidavits [submitted in connection with summary judgment motions] shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Whatley's "affidavit" does not comply with this rule.  The "affidavit" contains numerous exhibits including a transcript of the hearing before the Workers Compensation Commission.[6] Whatley's affidavit is sixty pages, much of which is devoted to an analysis of the testimony during this hearing.  It is largely irrelevant to the issues in this case.

6.      Defendants' "Reply to Plaintiff's Response to Defendants' Motion to Dismiss and Motion for Summary Judgment." (Doc. No. 51).

The undersigned has considered all these pleadings in preparing this Report and Recommendation.  The below discussion applies to defendants' motion for summary judgment as it relates to Whatley's remaining claims and their motion to dismiss for discovery abuse. (doc. No. 28).

---

[5](...continued)
updated "Light of Truth" letter (Doc. No. 59) filed August 15, 2006, Whatley advises that the WCC order has been upheld by the full Workers Compensation Commission. Defendants' motion to strike is **denied**, and the undersigned has considered Doc. No. 44 in preparing this Order and Recommendation.

[6]Whatley submitted additional documents to his affidavit, mainly copies of e-mails, on February 1, 2006 (Doc. No. 50).

## **Standard for Summary Judgment**

When no genuine issue of any material fact exists, summary judgment is appropriate. <u>Shealy v. Winston</u>, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. <u>Id.</u> Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. <u>Ballinger v. North Carolina Agric. Extension Serv.</u>, 815 F.2d 1001, 1005 (4th Cir.), <u>cert. denied</u>, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "'the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material fact</u>.'" <u>Id.</u> (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." <u>Temkin v. Frederick County Comm'rs</u>, 945 F.2d 716, 718 (4th Cir. 1991) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." <u>Id.</u> at 718-19 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." <u>Baber v. Hosp. Corp. of Am.</u>, 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations

4

to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits [see Fed. R. Civ. P. 56(e)], depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corporation, 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Services Co., 875 F. Supp. 1115 (D.Md. 1995).

### Facts in Light Most Favorable to Plaintiff[7]

1.     Whatley is a Christian (Whatley Aff., § A.1.a., p. 1).

2.     Whatley is the son of Micky Whatley, a former member of the South Carolina House of Representatives and a close associate of (now) Senator Jake Knotts (Whatley Aff., § F, pp. 14-15 ).

3.     DPS hired Whatley in March of 2000 (Pl. Dep., Ex. 6) as a Senior Resource Consultant II (WCC Order, 4).

---

[7]These facts are summarized largely from Whatley's deposition ("Pl. Dep. ___"), excerpts of which are attached to defendants' motion for summary judgment with exhibits attached there. ("Pl. Dep. Ex. ___"); affidavits of Don Royal, David Burgis and Marcia Adams attached to defendants' motion; documents relating to claims of religious harassment attached to defendants' memorandum as Exhibit G ("Ex. G"); Order of the South Carolina Administrative Law Court attached to defendants' Motion to Strike Plaintiff's "Addendum for Supportive Factual Evidence for the Plaintiff's Summary Judgment" ("ALJ Order ___") and Order of the South Carolina Workers Compensation Commission attached to the aforesaid addendum ("WCC Order ___").

4.      At relevant times:

     a.      Rose was Director of DPS;

     b.      Burgis was Director of DMV which was a division of DPS (Burgis Aff., ¶ 2);

     c.      Adams was a financial and program administrator at DMV and reported to Burgis;

     d.      Early was supervisor of "Project Phoenix," a project to modernize DMV's computer system and the organizational name of DMV's information technology office; and

     e.      Cockrell was the network manager of Project Phoenix.

5.      Whatley's function was to assist and advise Early in technical aspects of the implementation of Project Phoenix. (Pl. Dep. 11).  One of Whatley's job functions was to assist in the development and management of the DMV Q-Matic traffic management system.  "The Q-Matic system is a computer system in operation at ...DMV Field Offices.  Based on queues of customers regarding their reasons for visiting the field office, the system directs the flow of customers at the office to improve efficiency." (ALJ Order, 2, n. 1).  Q-Matic was begun in several offices as a pilot project.  Severe problems were encountered during implementation.  Presently, it is credited with substantially reducing waiting lines at DMV offices.

6.      On May 23, 2000, Early e-mailed Whatley: "There is still an issue of your bible (sic) on your desk.  Please make sure not to display religious items while you are at work." (Ex. G).

7.      At a meeting with Early on June 2, 2000, Whatley disagreed with the purchase of certain computer hardware for Project Phoenix and told Early that he would inform Rose of his dissent. (Ex. G).

8.      On August 2, 2000, Burgis e-mailed Whatley: "I have already told you to stop talking about your religious faith at work.  You are at work to work and nothing more."  Whatley responded with an e-mail to Burgis and Early in which he defended his right to talk with others at work about his faith and his refusal to "stop even against persecution from you." (Id.).

9.      On August 18, 2000, Early e-mailed Whatley: "Please do not talk with anyone at work about your religious faith.  David has already warned you about this." (Id.).

10.     On March 20, 2001, Early told Whatley that he should separate church and state and that while at work he should not talk about or display Christian subject matter. (Id.)

11.     Cockrell was hired as an IT manager in March of 2001 and became Whatley's immediate supervisor (WCC Order, p. 5).

12.     On July 10, 2001, Early and Burgis interrupted a conversation between Whatley and another employee and told them that "state employees should not be outspoken about religion." (Ex. G)

13.     On August 10, 2001, Early warned Whatley not to talk about Jesus while at work. (Id).

14.     On November 13, 2001, Early e-mailed Whatley: "I keep getting complaints that you are still talking at work about your faith.  David and myself have both told you a number of times to stop." (Id).

15.     On February 19, 2002, Early and Cockrell approached Whatley about talking to his connections in the state legislature to derail a proposal to move Project Phoenix from its location at Outlet Point Mall in Columbia to a building in Blythewood. Whatley refused. (Id.).

16.     On February 21, 2002, they approached Whatley again. He again refused and told them, "I do not feel that it was right based on my faith and what I think may not be right for the state." (Id.).

17.     On February 26, 2002, Early suggested that Whatley contact Rep. Rick Quinn about the issue. Whatley stated he would only do so if ordered. (Id.).

18.     On March 6, 2002, Early and Cockrell asked Whatley if he had spoken to Quinn. Again, Whatley expressed reservations based on his faith, and told them he had not contacted Quinn. Early and Cockrell instructed Whatley to speak to Quinn that day. Whatley proceeded to the State House, but instead of talking to Quinn, he met with his father and Senator Knotts. They surreptitiously recorded a telephone call placed by Whatley to Early. Whatley told Early that he had spoken to Quinn, but Quinn told him that he needed a request in writing. Early became upset and yelled at Whatley for possible violation of state lobbying laws. (Id.).

19.     The next morning, March 7, 2002, Whatley met with his father, Senator Knotts, and Rose in the parking lot of the Riverbanks Zoo. They gave Rose a copy of the tape recording of the conversation the previous day between Whatley and Early. Rose told Whatley to go back to work and that he would not be terminated. (Id.).

20.    Whatley's father did not run for re-election so he was not a member of the legislature when it convened in January of 2003. (Id.)

21.    On February 11, 2003, Whatley asked Early if he would take the next week off because he had been working extensive overtime. Early granted the request. (Id.)

22.    The next week, Early called Whatley who was home on leave and admonished him for being absent without leave. Whatley reminded Early of their previous conversation. Early told him in the future to use a formal annual leave request. (Id.).

23.    On February 24, 2003, Senator Knotts called Whatley and told him that Early had criticized him for abusing the leave policy. (Id.).

24.    On May 12 and 14, 2003, Cockrell warned Whatley to cease talking about his faith in the office. (Id.).

25.    On May 16, 2003, Cockrell told Whatley that Burgis was receiving complaints that Whatley was attempting to spread his faith while at work. (Id.).

26.    On May 23, 2003, Whatley noticed that his Bible and some of his religious research books were missing from the desk in his office. (Id.).

27.    In May of 2003, Burgis (Director of DMV) decided to transfer Whatley and Q-Matic operations to DMV field office administration. He directed Paul Johnson ("Johnson"), the DMV Director of Human Resources, to coordinate the transfer. (Burgis Aff., ¶ 4).

28.    Johnson drafted a memorandum advising Whatley of the reassignment on May 19, 2003. (WCC Order, pp. 9-10).

29.    Whatley went to his office on Monday, May 26, 2003 (the Memorial Day holiday) and found Johnson's memorandum of transfer in his chair. His salary was unchanged. (Ex. G.).

30.    Whatley filed a grievance pursuant to DPS policy contesting his "involuntary transfer" on May 29, 2003. (Def. Mem., Ex. D). The grievance was denied, and the denial was later upheld on appeal to the State Budget and Control Board. Id.

31.    In June of 2003 by Act of the legislature, DMV became a separate agency no longer a division of DPS. Burgis resigned and Marcia Adams became DMV's Executive Director.[8] (Burgis Aff., ¶ 2; Royal Aff., ¶ 2; Adams Aff., ¶ 2).

32.    Beverly Hamilton ("Hamilton") became Whatley's new supervisor. (Ex. G).

33.    Apparently, Whatley took sick leave on Monday, June 1, 2003. (Id.).

34.    Whatley reported to his new duty station on Park Street at 8:30 a.m. on June 2, 2003. Whatley's new office was in a storage section of the mail room at Park Street. Hamilton instructed Whatley to go to his old office to retrieve his belongings. Whatley told her he was ill and was going to a doctor. Hamilton requested a letter from Whatley's doctor describing his illness. (Id.).

35.    Whatley left Park Street and saw his doctor. Whatley told Hamilton that he would not return to work until approved by his doctor. Hamilton questioned the legitimacy of Whatley's illness. (Id.).

36.    Whatley never returned to work.

---

[8]The separation became official as of June 5, 2003. See 2003 S.C. Act. No. 51; S.C. Code Ann. § 56-1-5.

37.    Whatley was on FMLA leave from June 3 through August 26, 2003.  As of that date, Whatley was placed on leave without pay. (Pl. Dep., 142-43 and Ex. 8).

38.    On June 9, 2003, Hamilton telephoned Whatley and accused him of abusing sick leave. (Ex. G.).

39.    On June 20, 2003, Whatley received a reprimand from Adams for abusing sick leave. (Id.).

40.    In September of 2003, Whatley was notified that his position was to be eliminated due to a RIF. (Pl. Dep. 135).

41.    Whatley was terminated on October 1, 2003 through the RIF. (Pl. Dep. 139).

42.    Whatley filed separate charges of discrimination with the South Carolina Human Affairs Commission against DPS and DMV, the first being filed on or about November 24, 2003. (Pl. Dep.. 71 and Ex. 2 and 3).

**<u>Discussion</u>**

Whatley's complaint was drawn by his attorney.  However, the claims are not clearly presented.  At the outset, the undersigned observes that most of Whatley's arguments relate to his "Whistleblower - Title VII § 703(a)" claim (Fourth Cause of Action) which has been dismissed. Throughout his various pleadings Whatley emphasizes that the actions taken against him were because of his whistleblowing activity, i.e., his report to Rose in June of 2000 with respect to the purchase of computer hardware for Project Phoenix[9] and his objection to contacting members of the

_____

[9]It appears Whatley's concern about the viability of this hardware for use in Project Phoenix were unfounded. (WCC Order, p. 15).

legislature to stop the relocation of the Project Phoenix office from Outlet Point Mall to Blythewood in February and March of 2002. [See Whatley Aff. (Doc. No. 49), pp, 7 and 15].

A.     Title VII - Religious Discrimination

Whatley alleges religious discrimination by his employers, DPS and DMV. Defendants recognize that the complaint alleges a claim for "religious discrimination," but they limit their discussion to Whatley's hostile work environment claim because "the only evidence of 'religious discrimination' Plaintiff discussed in his deposition, or otherwise produced, concerned several alleged incidents of religious harassment." (Def. Mem. Doc. No. 33, p. 11, n.7).  Whatley does not clearly challenge this limitation.  On page three of his response to defendants' motion for summary judgment (Doc No. 42), Whatley lists religious discrimination as one of his claims.  On page six of that pleading, Whatley gives examples of religious discrimination, i.e., removing a Bible from his desk and warning him he could be disciplined for discussing faith related matters while at work.  Thus, Whatley does not appear to assert that any tangible employment action directed against him by DPS and/or DMV, e.g., his termination, were based on his religion.

In order to avoid summary judgment on this claim, Whatley must produce evidence to show that: (1) he experienced unwelcome harassment; (2) the harassment was based on his religion; (3) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. Baqir v. Principi, 434 F.3d 733, 745-46 (4th Cir. 2006).

In Faragher v. City of Boca Raton, 524 U.S. 775 (1998), the Supreme Court reaffirmed its previously articulated standard for determining when a plaintiff has established a hostile work environment in violation of Title VII, stating that a plaintiff must establish that the environment was

"both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993)).  Actionable harassment occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult." Harris, 510 U.S. at 21.  Among the circumstances examined are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. at 21.

In Burlington Indus., Inc. v. Ellerth 524 U.S. 742 (1998) and Faragher, the Supreme Court held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by [the employee's] supervisor." Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807. If an employee is harassed by a supervisor, the employer is strictly liable where the harassment resulted in a tangible employment action against the employee.  Id.  In this context, a "tangible employment action" means termination, demotion, reassignment, etc.  Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 266 (4th Cir. 2001).  If no tangible employment action is shown, plaintiff may still prevail unless the employer can establish the affirmative Faragher/Ellerth defense by showing: (1) that it exercised reasonable care to prevent and promptly correct any sexually harassing behavior  and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective procedures that the employer provided.

Defendants argue that they are entitled to summary judgment because the incidents relied on by Whatley were not sufficiently severe or pervasive to alter the conditions of his employment or to create an abusive environment.  Alternatively, they argue that if Whatley was subjected to a

13

hostile work environment because of his religion, he failed to use the procedures established by DPS and DMV policy to prevent and correct the harassment.

a.     Severe and Pervasive

Defendants assert that Whatley has not presented sufficient evidence to sustain a claim of severe and pervasive conduct resulting in a hostile work environment based upon his Christian religion.  As a threshold issue, it must be determined what conduct by defendants supports Whatley's claim. Defendants assert that only conduct occurring within 300 days of the filing of Whatley's SCHAC charge can be considered [Def. Mem. (Doc. No. 33), 11-14].  Whatley has not responded to this argument.

As noted above, Whatley filed his SCHAC charge on November 24, 2003.  Defendants meticulously asked Whatley at his deposition what facts supported his claims for religious discrimination.  Whatley described only a number of occasions when he was admonished about speaking openly of his religion. (Pl. Dep., 51-81).  Defendants now argue that Whatley may only rely on those instances about which he testified and that he is limited to those instances which occurred within 300 days of November 24, 2003.[10]  Defendants cite National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002) [Def. Mem. (Doc. No. 33) 13].  Defendants grossly misinterpret the holding of this case.  The Supreme Court differentiated between claims based on "discrete acts" of discrimination and a hostile work environment claim.  It held that the 300-day statutory filing period applies to claims based on discrete acts of discrimination.[11]  The Court further held that since "the incidents constituting a hostile work environment are part of one unlawful employment practice, the

_____

[10]This would be those instances occurring after January 27, 2003.

[11]The Court defined discrete acts as including "termination, failure to promote, denial of transfer, or refusal to hire." Id. at 114.

14

employer may be held liable for all acts that are a part of this single claim. In order for the charge to be timely, the employee need only file a charge within...300 days of any act that is part of the hostile work environment." Id. at 118.

In addition to the deposition testimony cited above, there is other evidence relating to Whatley's claim of hostile work environment based on his religion. Specifically, defendants have attached an "electronic calendar" upon which Whatley appears to have made contemporaneous notations throughout the course of his employment as Exhibit G of their memorandum (Doc. No. 33).[12] Also included in Defendants' Exhibit G are e-mails expressing concern over Whatley's expressions of faith during work. The undersigned considered all of this information in compiling the "Facts" listed above. The undersigned concludes that all this information should be considered in analyzing Whatley's hostile work environment claim.

However, even considering this entire record, the undersigned finds that Whatley has not shown that the conditions were objectively offensive, i.e., conditions that a reasonable person would find hostile or abusive.[13] This conclusion is based on an examination of the circumstances outlined in Harris v. Forklift Sys., Inc., 510 U.S. at 21.

a.    Frequency of Conduct

Whatley alleges a hostile work environment based on comments of his supervisors, Early, Cockrell, and Burgis. The record shows four e-mails and three verbal warnings in 2000 and 2001 (See "Facts" 6, 8, 9, 10, 12, 13, and 14). There were no such warnings in 2002. In mid-May, there were three warnings (Facts 24 and 25) and Whatley noticed religious

---

[12]This electronic calendar covers the period of February 2000 through December 2003.

[13]The undersigned concludes that Whatley has shown that the conditions were subjectively offensive, i.e., he perceived them to be so.

books missing from his desk (Fact 26).  Thus for approximately a year and a half, there were no reported warnings until mid-May 2003.

        b.     Physically threatening/humiliating/offensive utterance.

        There is no evidence that any conduct by Early, Cockrell, or Burgis was physically threatening or was meant to humiliate Whatley.  They simply warned him to cease expressing religious views in the workplace.  There is no instance where Whatley was held up to public ridicule because of his religion.  On a couple of occasions, Whatley testified that he overheard comments that he was a religious fantastic.  However, there is no indication that anyone else heard the comments or that Whatley was meant to hear them.[14]

        c.     Interference with work performance.

        There is no evidence that the comments of Early, Cockrell, and Burgis interfered with Whatley's job performance, or that his job performance was impaired prior to May 2003.[15]  The undersigned recognizes that in the light most favorable to Whatley he "sustained a mental/mental and/or mental/physical injury [in May/June 2003] arising out of the course of his employment..." (WCC Order, p. 2).  However, the Order awarding Whatley benefits under the South Carolina Workers Compensation Act, upon which Whatley heavily relies, scarcely mentions the criticism for discussing religion at work. (See WCC Order 5 and 8).  The gist of the Order is that the "hostile environment began after his meeting at the legislature and complaints about the needs for the computer system," (WCC Order 18), i.e., Whatley's alleged whistleblowing.

_____

[14]See Ex. G (August 2, 2000; March 11, 2002; and June 2, 2003) and Pl. Dep. 62-3.

[15]In fact it could reasonably be concluded that defendants encouraged Whatley to work instead of engaging in non-work related conversation.

Thus, the undersigned concludes that neither the record, nor the Workers Compensation Commission Order, support a finding that Whatley was subject to a hostile work environment based on his religion.

2.     Faragher/Ellerth Defense

Defendants argue that even if Whatley could establish a prima facie case of religious discrimination, they are still entitled to summary judgment because he failed to take advantage of the preventative and corrective procedure under DPS policy.  Whatley has not directly responded to this argument.

DPS maintains a grievance policy.[16]  Whatley received a copy of the policy when he began working for DPS. (Pl. Dep., 161 and Ex. 13).  It is obvious that Whatley was aware of the grievance policy because he used it to complain about his "involuntary transfer," i.e., the transfer in June of 2003.[17]  However, Whatley testified at his deposition that he never followed the policy by reporting religious harassment to the DPS Human Resources Department by filing a grievance. (Pl. Dep., 95).  Thus, defendants have established that Whatley failed to use the procedures available to him to report religious harassment.

B.     Retaliation

Whatley alleges that DPS and DMV retaliated against him in violation of Title VII, for exercising his rights under the FMLA, and in violation of the South Carolina Whistleblower Act.  These claims fail for various reasons as discussed below.  Insofar as Whatley asserts that his

---

[16]The policy is not a part of the record in this case.

[17]The grievance was denied because the transfer did not meet the definition of involuntary transfer of DPS. (Def. Mem., Ex. D).

termination was retaliatory, defendants argue that they have proffered a legitimate non-discriminatory reason for that action, i.e., the RIF based on a series of budget cuts.

      1.      Title VII[18]

To establish a prima facie case of retaliation, it must be demonstrated that:

     (1)    the employee engaged in protected activity;

     (2)    the employer took some adverse employment action against the employee; and

     (3)    a causal connection existed between the protected activity and the adverse action.

See Von Gunten v. Maryland, 243 F.3d 858, 863 (4th Cir. 2001); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998); Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994).   If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for the adverse action.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual, and that his termination was motivated by discrimination.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000); see also Duncan v. Commonwealth of Virginia Dep't of Corrections, 9 Fed. Appx. 236, 2001 WL 565672 (4th Cir. May 25, 2001)(unpublished).

A plaintiff need not have filed a formal complaint with the Equal Employment Opportunity Commission or a state deferral agency to engage in a protected activity.  Complaints to supervisory or management employees concerning harassment or discriminatory treatment as well as informal

---

[18]Defendants do not separately discuss retaliation under Title VII, perhaps because of the confusing manner in which Whatley's claims are presented.  See Complaint, p. 6.

complaints, filing of internal grievances, and complaints to an agency are included within the definition of protected activity. Warren v. Halstead Industries, Inc., 802 F.2d 746, cert. denied, 487 U.S. 1218 (1988) and Mitchell v. Baldrige, 759 F.2d 80 (D.C. Cir. 1985).

Whatley has not established a prima facie case of retaliation as prohibited by Title VII because he has not shown that he engaged in protected activity prior to his termination. An alleged protected activity may fall within § 2000e-3(a)'s "opposition clause" or its "participation clause." A different analysis is employed dependent upon which clause is implicated.

"Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." Laughlin v. Metropolitan Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998). To determine whether an employee has engaged in legitimate opposition activity, courts must "balance the purpose of [Title VII] to protect persons engaging reasonably in activities opposing...discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981).

"Participation activity encompasses, as outlined in the statute, making a charge, testifying, or participating in a Title VII investigation, proceeding or hearing. Kubico v. Ogden Logistics Servs., 181 F.3d 544 (4th Cir. 1999). The reasonableness test of the opposition clause analysis is inapplicable to the consideration of a claim under the participation clause. This distinction is based on the broad statutory language ("participated in any manner") with respect to the participation clause. Kubico, 181 F.3d at 551. Further, "(a)ctivities under the participation clause are essential to the machinery set up by Title VII." Laughlin, 149 F.3d at 259, n. 4.

As the Court indicated in its Order of March 3, 2006, a Title VII reprisal claim must be based on some activity of the plaintiff which is protected by Title VII.  As discussed above, it appears the only Title VII claim asserted by Whatley is that he was subjected to a hostile work environment based on his religion.  He never reported such a claim to Human Resources.  Whatley filed his charge with SCHAC after his termination.  Insofar as Whatley has alleged a Title VII retaliation claim, it should be dismissed *sua sponte*.

2.    FMLA

"Qualifying employees are guaranteed 12 weeks of unpaid leave each year by the Family and Medical Leave Act of 1993."  Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 84 (2002).  "Congress enacted the FMLA in response to growing concerns about 'inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods.'"  Babcock v. BellSouth Advertising and Publishing Corp., 348 F.3d 73, 76 (4th Cir. 2003), quoting Miller v. AT&T, 250 F.3d 820, 833 (4th Cir. 2001).

Under the FMLA, eligible employees may take leave "for medical reasons, the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b)(2).  The FMLA provides that eligible employees are entitled to up to 12 weeks of unpaid leave during any twelve month period, which can be taken by working a reduced number of hours per day or per week.  29 U.S.C. § 2612(a)(1); 29 U.S.C. § 2611(9).  Leave is permitted when an eligible employee has a "serious health condition" that makes the employee "unable to perform the functions of the position."  29 U.S.C. § 2612(a)(1).  The Act prohibits employers from interfering with or denying an employee the rights granted by the FMLA and grants employees a private right of action against employers who violate the Act.  29 U.S.C. § 2615(a)(1);  29 U.S.C.

§ 2617(a).  Employees who take leave pursuant to the FMLA are generally entitled to return to the same or equivalent position with the same benefits as they had prior to taking the leave.  29 U.S.C. § 2614(a)(1).  A serious health condition is defined as involving either inpatient care in a medical care facility or continuing treatment by a health care provider.  29 U.S.C. § 2611(11).

It is unclear how Whatley's sick, annual, and FMLA leave were applied to his absence beginning June 3, 2003.  By letter from Johnson to Whatley dated June 23, 2003, Whatley was advised that he was being placed on FMLA leave effective June 3, 2003.  By letter from Johnson to Whatley's attorney dated July 24, 2003, Whatley and the attorney were furnished leave request forms so that Whatley could maximize his annual, sick and FMLA leave by designating how he wished it to be applied.  The executed forms were never returned. (Pl. Dep., Ex. 8).

Whatley does not appear to assert that defendants violated any FMLA regulation, misapplied his annual, sick, or FMLA leave, or failed to allow him to take the full 12 weeks of unpaid leave he was due under the FMLA.  Thus, as of August 26, 2003, defendants were free to terminate Whatley because he was unable to return to work.[19]  Instead, they allowed him to remain on unpaid leave until he was terminated during the RIF.

### 3.     Whistleblower

The South Carolina Whistleblower Act establishes a private cause of action to any "employee" of a "public body" who suffers retaliation because he makes a "report" of waste or "wrongdoing" by the public body or its employees to an "appropriate authority."[20]  A "report"

---

[19]At his deposition conducted March 23, 2005, Whatley testified that he was medically unable to return to work as of August 26, 2003, and had been unable to return to work since that time.

[20]S.C. Code Ann. § 8-27-10 defines "public body," "employee," "appropriate authority,"
(continued...)

is "a written document alleging waste or wrongdoing that contains the following information: (a) the date of disclosure; (b) the name of the employee making the report; and (c) the nature of the wrongdoing and the date or range of dates on which the wrongdoing allegedly occurred." S.C. Code Ann. § 8-27-10(4). "Wrongdoing" is defined as (1) "action by a public body which results in substantial abuse, misuse, destruction, or loss of substantial public funds or public resources"; or (2) "an allegation that a public employee has intentionally violated...state statutory law or regulations...or a code of ethics, which violation is not merely technical or of a minimum nature." S.C. Code Ann. § 8-27-10(5). Actionable retaliation under the Whistleblower Act is defined as only dismissal, suspension from employment, demotion, or a decrease in compensation. S.C. Code Ann. § 8-27-20(A).

Several time limitations are provided by the Whistleblower Act. The employee must make his report within "sixty days of the date the reporting employee first learns of the alleged wrongdoing." S.C. Code Ann. § 8-27-10(4)(c). Any retaliation against the employee must have occurred "within one year after having timely reported an alleged wrongdoing" or it is not actionable. S.C. Code Ann. § 8-27-30. An employee must exhaust his administrative remedies under the State Employee Grievance Act, S.C. Code Ann. § 8-17-310, et. seq., before filing an action under the Whistleblower Act. Ransom v. S.C. Water Res. Comm., 467 S.E.2d 463 (S.C. Ct. App. 1996). The whistleblower action must be filed "within one year after accrual of the cause of action or exhaustion of all available remedies." S.C. Code Ann. § 8-27-30(B).

---

[20](...continued)
"report," and "wrongdoing."

22

It is clear that DPS and DMV are public bodies as defined by the Whistleblower Act. However, the individual defendants are not liable under the Act, and it is recommended that they be dismissed with respect to this claim.  It is also clear that Whatley exhausted his administrative remedies as required.  He filed two grievances–one with respect to his "involuntary reassignment" in May of 2003, and the other with respect to his termination, effective October 1, 2003. (See Def. Mem., Ex. D and E).

Defendants argue that they are entitled to summary judgment for at least two reasons.  First, Whatley did not file a report as defined and required by the Whistleblower Act.  Second, the alleged retaliation is not actionable because it did not occur within one year of the report of the alleged wrongdoing. (Def. Mem. 28-31).  Whatley has not directly responded to these arguments.

Whatley contends that he engaged in two acts of whistleblowing–reporting his disagreement with the purchase of certain computer hardware for Project Phoenix to Rose in June of 2000, and reporting the efforts of Early and Cockrell to require him to engage in improper lobbying activity to Rose (his father and Senator Knotts) in March of 2002.  Whatley asserts a plethora of retaliatory actions taken against him because of these two notifications to Rose.  However, the only retaliatory actions which may qualify under the Whistleblower Act are the two which resulted in the filing of grievances, i.e., retaliatory transfer (assuming this might be considered a demotion) and termination.

There is no evidence that Whatley filed a report with DPS or DMV as required by the Whistleblower Act on either of his alleged whistleblower claims.  The only written document cited by Whatley is an e-mail he sent to Early (with copies to Rose and others) on June 2, 2000.  See Pl. Aff. [Doc. 49], ¶ C-6, pp. 6-7 and Ex. 87 thereto.  This e-mail stated that the proposed purchase of the computer hardware was unwise because it "is not going to be able to provide the needed support

23

required by the DMV Field offices" and suggested purchase of a higher quality system. Id. There is no suggestion of wrongdoing as defined by the Whistleblower Act.

Whatley refers to no written document with respect to the allegation that he was asked to lobby by Early and Cockrell. Instead, he refers to his testimony during the Workers Compensation Commission hearing. See Pl. Aff. (Doc. No. 49), ¶ F-2, p. 15. That testimony shows that he reported the circumstances to his father and Senator Knotts who, in turn, telephoned Rose. See Pl. Aff. (Doc. No. 49), Ex. 57, pp. 28-36.

Even assuming that Whatley complied with the Whistleblower Act's reporting requirement, his claim is still barred because the alleged retaliation took place more than one year after the reports. The meeting at the Riverbanks Zoo where the request to lobby was orally reported to Rose occurred on March 7, 2002. The involuntary reassignment took place in May of 2003 and Whatley's termination was effective October 1, 2003.

It is, therefore, recommended that defendants' motion for summary judgment be granted as to Whatley's claim under the South Carolina Whistleblower Act.

4.      RIF

Insofar as Whatley alleges that he was terminated in retaliation for complaining of religious discrimination, exercising his FMLA rights, or engaging in activity as a whistleblower, defendants assert that his position was properly eliminated through the RIF. It is undisputed that DPS and DMV suffered severe budget cuts beginning in 2001 (Royal Aff., ¶ 3). DPS and DMV instituted various cost saving initiatives including retirement incentive plans, voluntary separation programs, and RIF's. (Id., ¶ 10).

DMV was a separate agency beginning in June of 2003. Thus at the time of his termination, Whatley was employed by DMV. Adams was the Executive Director. In her affidavit, she states that she directed that a RIF for DMV be instituted to reduce DMV's personnel and operating expenses. She states that "Whatley's position was one of the positions including (sic) in the reduction-in-force as a cost saving measure because we believed that his duties could be efficiently outsourced." She also stated that Whatley was notified he could apply for other positions at DMV but did not do so and that Whatley's position has not been filled since it was eliminated. (Adams Aff., ¶¶ 5-6). Whatley has produced no evidence to contradict these facts.[21]

C.      First Amendment

Whatley alleges that the individual defendants (see Order of March 3, 2006) retaliated against him because he exercised his First Amendment right to free speech in violation of 42 U.S.C. § 1983. Unfortunately, he does not specifically identify which speech he believes was constitutionally protected or which defendant took a particular action against him because of that speech. Defendants identify several instances of alleged protected speech based on Whatley's deposition testimony. These include the two whistleblowing incidents discussed above as well as an oral report Whatley made to Rose in 2001 or 2002 concerning the suspicious purchase of additional computer equipment and anonymous notification to SLED, the FBI, and news sources

---

[21]See Whatley's Aff. (Doc. No. 49), § K, p. 37. With respect to his termination, Whatley refers to inadmissible evidence, statements made to a Workers Compensation Commission Investigator, and confuses the reasons given for his "involuntary reassignment" with those for his termination.

about this additional purchase.[22] (Pl. Dep. 13-28). (See Def. Mem. 22-23).  Whatley makes no objection or comment on defendants' characterization of his First Amendment claim.

Section 1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any state..., subjects, or causes to be subjected, any citizen of the United States...to the deprivation of any rights...secured by the constitution...shall be liable to the party injured in an action at law....

The First Amendment to the Constitution guarantees freedom of speech.  Citizens do not forfeit all their First Amendment rights when they become public employees.  Connick v. Myers, 461 U.S. 138 (1983) and Pickering v. Board of Education, 391 U.S. 563 (1968).  "(A) State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech."  Rankin v. McPherson, 483 U.S. 378. 383 (1987).  Whether a restriction imposed by an employer on a public employee's speech violates the First Amendment requires a balance between the employee's interest, as a citizen, in speaking on matters of public concern and the employer's interest in delivering its services to the public.  Urofsky v. Gilmore, 216 F.3d 401, 406 (4th Cir. 2000).

The primary issue is whether the speech in question was that of a private citizen commenting on a matter of public concern.  If this is shown to be the case, the Court must then balance the employee's interest in First Amendment expression against the State's interest in maintaining proper operation of its workplace.  Pickering, 391 U.S. at 568.  The Court must examine the content, context, and form of the speech at issue in light of the entire record to determine whether the speech involves a matter of public concern. Urofsky, 216 F.3d at 406.  Generally, speech that involves

---

[22]There is no evidence that defendants were aware of Whatley's anonymous report, so this "speech" should not be considered.

social, political, or other issues of interest to the community constitutes a matter of public concern. Id.  It is recognized that speech by public employees made in the course of their job duties will frequently involve matters of public concern without giving those employees a First Amendment right to dictate to the employer how they will perform their job.  Id.

To prevail on a First Amendment retaliation claim, a plaintiff must show that: (1) he engaged in protected speech on a matter of public concern; (2) his interest in First Amendment expression outweighs his employer's interest in efficient operation of the workplace; (3) he was deprived of some valuable benefit; and (4) a causal relationship exists between his protected speech on matters of public concern and the loss of the benefit.  Huang v. Board of Governors of the Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990); Peters v. Jenney, 327 F.3d 307, 322-33 (4th Cir. 2003).

Defendants assert that they are entitled to summary judgment on this claim because Whatley's speech does not qualify as protected expression; that he was not deprived of a valuable benefit (other than his termination); and there was no causal relationship between his speech and his termination.  Whatley has not directly responded to these arguments.

1.    Protected Expression

To qualify as protected speech it must involve a matter of public concern. Speech involves a matter of public concern when it addresses an issue of social, political, or other interest to the community.  The content, context, and form of the speech at issue should be examined in light of the entire record.  Urofsky, 216 F.3d at 406.  The employee must show that he spoke as a citizen, not as an employee, on a matter of public concern.  McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998).

In the light most favorable to Whatley, his speech involved matters of public concern. He expressed his opinion to Rose, his father, and Senator Knotts that DPS and DMV were engaging in wasteful procurement procedures[23] in implementing Project Phoenix. Further, he protested to Rose, his father, and Senator Knotts that he had been asked to approach legislators on behalf of the agencies. This is apparently a violation of lobbying laws and/or regulations.

2.      Valuable Benefit

In the context of a retaliation claim, "a public employer contravenes a public employee's First Amendment rights when it discharges or 'refuses to rehire [the] employee,' or when it makes decisions relating to 'promotion, transfer, recall, and hiring based on the exercise of 'that employee's free speech rights.'" Ridpath v. Board of Governors Marshall Univ., 447 F.3d 292, 316 (4th Cir. 2006), quoting Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000).

The undersigned finds that under this test Whatley has shown that he lost a valuable benefit based on his transfer ("involuntary reassignment") and eventual termination.

3.      Causal Relationship

Whatley has produced no evidence of a causal relationship between his speech and his transfer and termination. The circumstances raise no inference of retaliation because of the lapse of time between the speech and the employment actions. Whatley's first report to Rose concerning the computer problems was in June of 2000. At his deposition, Whatley testified that he informed Rose in 2001 or 2002 that he felt the purchase of additional computer equipment was

---

[23]There is no evidence that the purchases were wasteful or that any law or regulation was violated.

a "cover up" of the fact that the initial equipment did not work properly.[24]   Whatley could not

remember if he e-mailed Rose or spoke with him in person.  No action was taken.  The incident

involving the lobbying attempt occurred in March of 2002.  Whatley's transfer occurred in late May

of 2003 and his termination became effective October 1, 2003.  Thus, the employment actions were

taken over a year after the alleged speech.  See Pike v. Osborne, 301 F.3d 182, 185 (4th Cir. 2002)

(Almost immediate termination in § 1983 free speech case is circumstantial evidence of causation)

and Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653. 657 (4th Cir. 1998)

("A lengthy lapse of time between the employer becoming aware of the [Title VII] protected activity

and the alleged employment action...negates any inference that a causal connection exists between

the two.").

        The causation requirement has been described as "rigorous."   Huang v. Bd. of Governors,

802 F.2d at 1140.  The plaintiff must show that "but for" the protected expression the adverse action

would not have been taken.  Ridpath v. Bd. of Governors, 447 F.3d at 318.  This necessarily means

that the employer, or the responsible official, knew of the protected speech.  Burgis was the official

responsible for the transfer (Burgis Aff., ¶ 5).  Whatley has offered no evidence that either of these

two officials was aware of the alleged protected speech.  Adams specifically disavows knowledge

of "Whatley's alleged 'whistleblowing' activities or religious activities." (Id, ¶ 3).  Last, defendants

have offered legitimate reasons for Whatley's transfer and termination which he has not rebutted.

See Carter v. Ball, 33 F.3d at 460.

---

    [24]As noted earlier, there is no evidence that any of the computer equipment did not function
as reasonably anticipated.

4.    Qualified Immunity

The Supreme Court in <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982), established the standard which the court is to follow in determining whether a defendant is protected by qualified immunity.

> Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

<u>Id.</u> at 818.

The Court of Appeals for the Fourth Circuit, discussing qualified immunity, stated:

> Qualified immunity shields a governmental official from liability for civil monetary damages if the officer's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  "In determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged."  Moreover, "the manner in which this [clearly established] right applies to the actions of the official must also be apparent."  As such, if there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity.

<u>Wiley v. Doory</u>, 14 F.3d 993 (4th Cir. 1994)(internal citations omitted), <u>cert. denied</u>, 516 U.S. 824 (1995).   As discussed above, Plaintiff fails to show that Defendants violated any of his clearly established constitutional or statutory rights.   Therefore, Defendants are entitled to qualified immunity in their individual capacities.

D.    Sanctions

Defendants filed a motion to dismiss this action pursuant to Fed. R. Civ. P. 37 and 41 on November 10 2005. (Doc. No. 28).  They renewed their arguments in their later motion for summary judgment.  Whatley filed a "Memorandum of Plaintiff's Updated Situation/Concern and

Response to Defendant's Motion to Dismissal" (Doc. No. 29/30) on November 23, 2005. Defendants filed a reply (Doc. No. 31) on December 1, 2005.

Review of the record shows that Whatley has resisted discovery by defendants throughout this case. He was deposed on March 22, 2005. Whatley's attorney conceded during the deposition that it would have to be reconvened because Whatley had not fully provided requested discovery (Whatley Dep. 12, 71 and 98). Counsel attempted to reschedule the continued deposition on several occasions to no avail. (Def. Mem., Ex. F). The parallel problem of Whatley's failure to respond to defendants' document production requests continued. Specifically, Whatley had failed to produce his income tax returns for relevant years and records relating to his application for Social Security disability benefits. (Id.). On May 31, 2005, defendants' counsel wrote Whatley's counsel contemplating delivery of discovery in advance of a proposed deposition on July 6, 2005. (Id.). On July 5, 2005, the deposition was cancelled. Plaintiff's counsel confirmed the cancellation by letter of July 5, 2005, stating that he would "advise Mr. Whatley to obtain his tax records and forward them to our office immediately. As soon as we receive these, we will forward the same to you." (Id.).

The tax records were never produced. On August 23, 2005, defendants filed a motion to compel. On August 30, 2005, Whatley's attorney filed a motion to be relieved (Doc. No. 16). This motion was based in large part on Whatley's apparent willful attempts to avoid discovery. In an affidavit attached to the motion, Whatley's counsel stated:

> 4.    That the Affiant has attempted on numerous occasions to communicate with the Plaintiff the discovery requirements and burdens required in such litigation and to seek thorough and complete answers to such requests. Such inadequate communication from the Plaintiff has frustrated the discovery process in this action.

31

5.      That the Plaintiff has failed to effectively and timely respond to requests for information and records on numerous occasions.

6.      That the Plaintiff and Affiant have reached a breakdown in communication as of August 24, 2005, in that the Plaintiff has been non-responsive to Counsel's repeated verbal and written communications.

A hearing was held on September 15, 2005, to consider the motions to compel and to be relieved. The motion to be relieved was granted and arguments were heard on the motion to compel, specifically with respect to the production of Whatley's tax returns. Following the hearing, the undersigned issued an order (Doc. No. 24) which stated in part:

On August 23, 2005, defendants filed a motion to compel production of documents. This motion relates to defendants' request for Whatley's state and federal income tax returns for years 2000, 2001, 2002, 2003 and each succeeding year until the trial of the case. (Defendants First Request for Production of Documents, Request No. 7). Whatley's responses were either incomplete or "incomprehensible." It further appears that Whatley underwent state and federal audits during this time frame, but no correspondence or other information concerning these audits was provided. Copies of Whatley's responses to defendants' requests are attached to the motion. Defendants' motion to compel is **granted**. Whatley shall fully and completely respond to defendants' document production requests concerning state and federal income tax returns from the year 2000 forward, including any and all information relating to audits on or before **October 28, 2005**. Further, Whatley shall immediately execute any consent forms presented to him by defendants to enable defendants to obtain tax information directly from the Internal Revenue Service and the South Carolina Department of Revenue. See Lischka v. Tidewater Services, Inc., 1997 WL 27066 (E.D.La. 1997) ("cases almost universally hold, explicitly or implicitly, that Rule 34, along with Rule 37, empowers federal courts to compel parties to sign written authorizations consenting to the production of various documents."). **Whatley is advised that a failure to comply with this order may result in sanctions, up to and including the dismissal of this action.**

Based on the above, discovery is extended in this case until **December 2, 2005** (all discovery requests shall be served in time for the responses thereto to be served by this date.). Defendants are given leave to notice a further deposition of Whatley after receipt of the tax information to be provided as required above. **Whatley is warned that a failure to appear**

**for his properly noticed deposition, or his failure to conduct the deposition in the manner required by the Federal Rules of Civil Procedure and the Local Rules of this Court may result in sanctions, up to and including dismissal of this action**. (Emphasis in original).

Defendants attempted to schedule Whatley's deposition on several occasions after the filing of this Order, but Whatley failed to respond. Finally, with the close of discovery approaching, defendants noticed the depositions of Whatley and his wife.[25] Whatley did not appear for his deposition, and defendants filed their motion to dismiss. Whatley has never complied with the order of September 16, 2005 compelling him to produce his tax returns.

Rule 37 of the Federal Rules of Civil Procedure provides for sanctions for a party's failure to make disclosures or to cooperate in discovery. Rule 37(b)(2) states in part:

> If a party. . . fails to obey an order to provide or permit discovery. . . the court may make such orders in regard to the failure as are just, and among others the following:...
>
> (c) An order...dismissing the action....

In <u>Robinson v. Yellow Freight System</u>, 132 F.R.D. 424 (W.D.N.C. 1990), <u>affirmed</u> 923 F.2d 849, <u>cert. denied</u>, 502 U.S. 831 (1991), Judge Potter discussed the proper application of Rule 37.

> Courts applying Rule 37 have found that the rule should not be applied as an initial remedy. See generally 4A <u>Moore's Federal Practice</u>, Par. 37.03 [2] at 37-88 (1990) (hereinafter "<u>Moore's</u>"). The harsh sanctions of dismissal cannot be utilized when the failure to obey the discovery order was a result of a party's inability to do so after good faith efforts at compliance. <u>Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers</u>, 357 U.S. 197, 2 L.Ed.2d 1255, 78 S.Ct. 1087 (1958). Courts have generally held that there must be some element of bad faith, willfulness, gross negligence, or callous disregard of the rights of

---

[25]The notice to Whatley's wife was ineffective as she is a non-party. A subpoena pursuant to Rule 45 is required to compel the attendance of a non-party for a deposition.

other litigants in order to justify imposition of the sanction of dismissal. See <u>Moore's</u> at 37-89.

The determination of whether the factual situation of any given case justifies dismissal for violation of a discovery order is left in the sound discretion of the trial court. See <u>National Hockey League v. Metropolitan Hockey Club</u>, 427 U.S. 639, 643, 49 L.Ed.2d 747, 96 S.Ct. 2778 (1976) (per curiam). "The question, of course, is not whether this Court, or whether the Court of Appeals would as an original matter have dismissed the action; it is whether the District Court abused its discretion in so doing." <u>Id.</u> at 642; see also <u>Wilson v. Volkswagen of American, Inc.</u>, 561 F.2d 494, 504 (4th Cir. 1988); <u>cert. denied</u>, 434 U.S. 1020, 54 L.Ed.2d 768, 98 S.Ct. 744 (1978). The sanction of dismissal must be available to the district court not merely to penalize conduct, but to deter those who might be tempted to such conduct in the absence of such a deterrent. Nonetheless, many courts have found that an abuse of discretion occurs when the district court dismisses an action without explicitly considering whether lesser sanction would effectively cure the improper behavior. <u>Moore's</u> at 37-94 (citing cases).

The Fourth Circuit Court of Appeals has directed that district courts consider four factors in deciding whether to impose the sanction of dismissal when a party fails to comply with a discovery order. See <u>Mutual Federal Savings & Loan Association v. Richards & Associates</u>, 872 F.2d 88, 92 (4th Cir. 1988); <u>McKenna v. Sovran Bank NA</u>, 9 Fed. Rules Serv. 3d 1249, 1252 (4th Cir. 1987) (unpublished) (citing <u>Wilson</u>, 561 F.2d at 503-06); <u>Aerodyne Systems Engineering, Ltd. v. Heritage International Bank</u>, 115 F.R.D. 281 (D.Md. 1987); <u>Snead v. Automation Industries</u>, 102 F.R.D. 823 (D.Md. 1984). The factors include: (1) whether the noncomplying party acted in bad faith; (2) the amount of prejudice his noncompliance caused his adversary, which necessarily includes an inquiry into the materiality of the evidence he failed to produce; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions. <u>Mutual Federal Savings & Loan</u>, 872 F.2d at 92.

It would be easy to conclude that Whatley has acted in bad faith at every step of the

discovery procedure. It is clear that the motion of Whatley's attorney to be relieved was premised

on Whatley's willing failure to cooperate with his attorney in responding to proper discovery

requests. Whatley has consistently maintained that he, nor his tax preparer, have complete copies of his returns. Whatley also states that he has requested copies of his returns from the Internal Revenue Service ("IRS") and the South Carolina Tax Commission ("SCTC"), but he has never received them. As implausible as these arguments sound, defendants have no proof otherwise. There is no indication that defendants sought discovery on the issue from other sources or that they exercised the alternative in the Court's order by providing Whatley with consent forms so that they could directly seek the returns.

However, Whatley failed to appear for his properly noticed deposition after a specific warning from the Court. He relies on language in the Order of September 16, 2005, that defendants could "notice a further deposition of Whatley after receipt of the tax information to be provided as required above." This portion of the order refers to the discussion at the hearing to attempt to insure Whatley's compliance with document production so that the documents would be available at the deposition. Whatley argues that since he never received the copies from the IRS and SCTC, defendants could not depose him. However, there was no condition precedent to reconvening the deposition. Whatley attempts to use his stonewalling as an excuse to avoid deposition.

The undersigned recommends that the sanction of dismissal be imposed because Whatley failed to appear for his deposition.

## Conclusion

Based on a review of the record and the above discussion, it is recommended that:

1.      Defendants' motion to dismiss (Doc. No. 28) be granted based on plaintiff's failure to attend his properly noticed deposition;

2.      Plaintiff's motion for summary judgment (Doc. No. 32) be denied;

3.      Defendants' motion for summary judgment (Doc. No. 33) be granted; and

4.      Insofar as plaintiff has alleged a Title VII retaliation claim, it should be dismissed *sua sponte*.

Respectfully submitted,

s/Joseph R. McCrorey
United States Magistrate Judge

September 1, 2006
Columbia, South Carolina

**The parties' attention is directed to the important information on the attached notice.**

**Notice of Right to File Objections to Magistrate Judge's Report and Recommendation
&
The Serious Consequences of a Failure to Do So**

      The parties are hereby notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within **ten (10) days** of the date of its filing. 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail. Fed. R. Civ. P. 6. Based thereon, this Report and Recommendation, any objections thereto, and the case file will be **delivered to a United States District Judge** fourteen (14) days after this Report and Recommendation is filed. Advance Coating Technology, Inc. v. LEP Chemical, Inc., 142 F.R.D. 91, 94 & n. 3 (S.D.N.Y. 1992). A magistrate judge makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge. See Mathews v. Weber, 423 U.S. 261, 270-271 (1976); and Estrada v. Witkowski, 816 F. Supp. 408, 410 (D.S.C. 1993).

      During the ten-day period, but not thereafter, a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he wishes the United States District Judge to consider any objections. **Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections.** Failure to file written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge. See United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir.), *cert. denied*, Schronce v. United States, 467 U.S. 1208 (1984); and Wright v. Collins, 766 F.2d 841, 845-47 & nn. 1-3 (4th Cir. 1985). Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he did not object. In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues. Howard v. Secretary of HHS, 932 F.2d 505, 508-509 (6th Cir. 1991). See also Praylow v. Martin, 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied*, 474 U.S. 1009 (1985). In Howard, supra, the Court stated that general, non-specific objections are *not* sufficient:

>     **A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless. \* \* \* This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. \* \* \* We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.**

*Accord* Lockert v. Faulkner, 843 F.2d 1015, 1017-19 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

>     **Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review. \* \* \* A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.**

See also Branch v. Martin, 886 F.2d 1043, 1046 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and Goney v. Clark, 749 F.2d 5, 7 n. 1 (3rd. Cir. 1984)("plaintiff's objections lacked the specificity to trigger *de novo* review"). This notice, hereby, apprises the parties of the consequences of a failure to file specific, written objections. See Wright, supra.; and Small v. Secretary of HHS, 892 F.2d 15, 16 (2nd Cir. 1989). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing addressed as follows:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201
